# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

<table>
<tr>
<td>

BETH HARTWELL-DENNIS,
individually and on
behalf of all others similarly situated,

                 Plaintiff,

    v.

GERBER PRODUCTS COMPANY,

                Defendant.


This Document Relates To:
*In Re: Gerber Products Company Heavy
Metals Baby Food Litigation, Master File
No. 1:21-cv-00269-LO-TCB*

</td>
<td>

CLASS ACTION COMPLAINT

CIVIL ACTION NO:

**<u>JURY TRIAL DEMANDED</u>**

</td>
</tr>
</table>

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Beth Hartwell-Dennis ("Hartwell-Dennis" or "Plaintiff"), on behalf of herself and all others similarly situated, by and through her undersigned attorneys, alleges against Gerber Products Company ("Gerber" or "Defendant"), the following facts based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## NATURE OF THE ACTION

*Baby food manufacturers hold a special position of public trust.*
*Consumers believe that they would not sell unsafe products.*
*Consumers also believe that the federal government would not*
*knowingly permit the sale of unsafe baby food...baby food*
*manufacturers and federal regulators have broken the faith.[1]*

1.     The health and safety of infants and children are of the utmost importance.  Yet,
Defendant, the baby food manufacturer, who vowed to protect and keep them safe, recklessly
disregarded the safety, health, and well-being of millions of babies, toddlers, and children by
knowingly selling baby food products containing dangerous amounts of toxic heavy metals:
inorganic arsenic, lead, cadmium, and mercury (hereinafter collectively referred to as "Toxic
Heavy Metals").  Toxic Heavy Metals are particularly hazardous to infants and children because
they are developmental neurotoxins, meaning that exposure can significantly harm a baby's
developing brain and nervous system, both in utero and after birth.  The effects often cause
permanent loss of intellectual capacity, behavioral issues, such as Attention-Deficit/Hyperactivity
Disorder ("ADHD"), and intelligence quotient ("IQ") loss.

2.     Plaintiff put her trust in Defendant.  She relied on assurances from Gerber that its
baby food products were of the highest quality.  Most importantly, Plaintiff believed Defendant's
representations that its baby food products were safe.  Yet, Defendant knowingly concealed all
material information about Toxic Heavy Metals, internal and external testing results, and its
products' hazards.  Defendant sacrificed the health and safety of infants, children, parents, and
caregivers, to increase corporate revenue.  Defendant lied to Plaintiff and millions of consumers

---

[1] Staff Report, Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter referred to as "**Congressional Report**") (Feb. 4, 2021) (https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf) (last visited on Sept. 29, 2021), attached hereto as **Exhibit A**.

and broke their trust and faith, by actively marketing and selling baby food products as safe while Defendant knew that its products were unsafe and contained dangerous amounts of Toxic Heavy Metals but decided to sell the products to parents anyway.

3.     Plaintiff brings this class action on behalf of herself, a proposed nationwide class, and a proposed New Jersey subclass.  The nationwide class is defined as follows: All persons who purchased one or more of Defendant's products containing Toxic Heavy Metals, in the United States for personal/household use (hereinafter the "Nationwide Class").  The New Jersey subclass is defined as follows: All persons residing in New Jersey who purchased one or more of Defendant's products containing Toxic Heavy Metals for personal/household use (hereinafter the "Subclass").[2]  Plaintiff and members of the Class seek injunctive and monetary relief based on Defendant's false advertising scheme and deceptive business practices in violation of consumer protection laws.

4.     In April 2019, Healthy Babies Bright Futures, an alliance of nonprofit organizations, that actively work together to reduce babies' exposures to toxic chemicals ("Healthy Babies Bright Futures"), issued a report detailing the evaluation of 168 containers of various baby food products that lead to the disturbing revelation that 95% of the 168 products tested contained one or more Toxic Heavy Metals.[3]  Healthy Babies Bright Futures found that the samples had heavy metals, including arsenic, lead, mercury, and cadmium. Healthy Babies Bright Future's report stunned lawmakers and individuals throughout the country.

5.     Shortly thereafter, on November 6, 2019, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform

---

[2] The Nationwide Class and Subclass are collectively referred to herein as "Class" unless otherwise noted.
[3] Healthy Babies Bright Futures, *Arsenic in 9 Brands of Infant Cereal* (Dec. 2017) (https://www.healthybabycereals.org/sites/healthybabycereals/files/2017-12/HBBF_ArsenicInInfantCerealReport.pdf) (last visited on Sept. 29, 2021).

("Congressional Subcommittee") opened an investigation, and requested internal documents and test results from seven of the largest baby food manufacturers in the United States: (1) Gerber, (2) Hain, (3) Beech-Nut, (4) Walmart, Inc., which sells products through its private brand Parent's Choice (hereinafter "Walmart"), (5) Sprout Foods, Inc., which sells food under the name Sprout Organic Food (hereinafter "Sprout"), (6) Campbell Soup Co., which sells baby food under the name Plum Organics (hereinafter "Campbell"), and (7) Nurture, Inc., which sells baby food under the names "HappyFamily Organics," "HappyBABY," and HappyTOT (hereinafter "Nurture" or "HappyBABY").[4]

6.      In response to the Congressional Subcommittee's request, Gerber produced its internal testing policies and test results for both ingredients and finished products.

7.      Subsequently, on February 4, 2021, the Congressional Subcommittee published a detailed report, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter referred to as "Congressional Report") exposing Gerber's reckless disregard for the health and safety of babies by knowingly selling baby food products with dangerously elevated levels of Toxic Heavy Metals.  The Congressional Report also determined:

a.   Industry self-regulation fails to protect consumers as Defendant set its own dangerously high internal standards for Toxic Heavy Metals,

b.   Defendant routinely ignored established standards and continued to sell products with high levels of Toxic Heavy Metals levels, and

c.   Defendant's prevalent practice of only testing individual ingredients that are included in its products instead of the finished product concealed high levels of Toxic Heavy Metals in finished baby food products.

---

[4] *See* **Exhibit A** at p. 2.

8.      The Gerber products at issue include: Gerber Toddler Mashed Potatoes & Gravy with Roasted Chicken Meal, Gerber Toddler Pick-ups Chicken & Carrot Ravioli Meal, Gerber Toddler Spaghetti Rings in Meat Sauce Meal, Gerber Toddler Spiral Pasta in Turkey, Meat Sauce Meal, Gerber Toddler Pick-ups Chicken & Carrot Ravioli Meal, Gerber Toddler Spaghetti Rings in Meat Sauce Meal, Gerber Sitter 2nd Foods Turkey Rice Dinner Plastic Tub, Gerber Sitter 2nd Foods Vegetable Beef Dinner Plastic Tub, Gerber Toddler Pick-ups Chicken & Carrot Ravioli Meal, Gerber Sitter 2nd Foods Apple Chicken Dinner Plastic Tub, Gerber Sitter 2nd Foods Vegetable Beef Dinner Plastic Tub, Gerber Toddler Mashed Potatoes & Gravy with Roasted Chicken Meal, Gerber Toddler Pick-ups Chicken & Carrot Ravioli Meal, Gerber Toddler Spaghetti Rings in Meat Sauce Meal, Gerber Toddler Spiral Pasta in Turkey Meat Sauce Meal, and Gerber Sitter 2nd Foods Turkey Rice Dinner Plastic Tub (hereinafter collectively referred to as "Baby Food Products").

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 (hereinafter referred to as "CAFA") codified as 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; the number of members of the proposed Class exceeds 100; and the Plaintiff and members of the proposed Class are citizens of a state different than Defendant.

10.     This Court has personal jurisdiction over Defendant because Defendant maintains its corporate headquarters in Virginia.  In addition, Defendant regularly sells and markets its Baby Food Products in this District.

11.     Venue is proper in this Court, because a substantial portion of the events complained of herein took place in this District, and the Court has jurisdiction over Defendant, and Defendant has intentionally availed itself of the laws and markets of this district.

## THE PARTIES

12.     Plaintiff Beth Hartwell-Dennis is a resident of New Jersey.  Plaintiff purchased Gerber's Baby Food Products from Walmart, Shoprite, Extra Supermarket, and Super Fresh Supermarket in various locations around her home in Essex County, New Jersey.  Plaintiff regularly purchased these products since 2019 and reviewed and relied on the representations on the packaging and believed the products to be safe and suitable for babies.  Plaintiff's purchases took place when testing showed that Defendant's Baby Food Products contained harmful heavy metals.  Plaintiff would not have purchased the products if she had known that the products were unsafe and unsuitable for babies, contained heavy metals, the levels of heavy metals in the products, testing results showed these products contained harmful levels of Toxic Heavy Metals, or that the Defendant's policies permitted the sale of products with harmful levels of Toxic Heavy Metals.

13.     Defendant Gerber is incorporated in Virginia.  Its headquarters and principal place of business is located at 1812 N. Moore St. Arlington, Virginia 22209.  Defendant's Baby Food Products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.  Gerber is a subsidiary of Nestle.  Nestle USA is incorporated in Delaware and headquartered in Arlington, Virginia.

14.     Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells the Baby Food Products throughout the United States, including in this District.  The advertising, labeling, and packaging for the Baby Foods, relied upon by Plaintiff

were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein.  The marketing, advertising, packaging, and labeling for the Baby Food Products were designed to encourage consumers to purchase the Baby Food Products and reasonably misled the reasonable consumer, i.e., Plaintiff and the Class, into purchasing the Baby Food Products.  Defendant owns, manufactures, and distributes the Baby Food Products, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Baby Foods.  Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished Baby Food Products.

## FACTUAL ALLEGATIONS

I. **THE DANGERS OF TOXIC HEAVY METALS TO CHILDREN'S HEALTH IS WELL DOCUMENTED.**

15.     The Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared Toxic Heavy Metals dangerous to human health, particularly to babies and children, who are at the greatest risk of harm and most vulnerable to their neurotoxic effects.[5]

16.     Decades of scientific studies examining the dangers of Toxic Heavy Metals demonstrate the harmful effects of inorganic arsenic, lead, cadmium, and mercury.  Specifically, studies show that even low levels of exposure to Toxic Heavy Metals cause developmental problems in babies and children, which result in permanent decreases in IQ and economic

---

[5] Food and Drug Administration, *Metals and Your Food* (www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food) (last visited on Sept. 29, 2021).

productivity and increased risk of behavioral issues and criminal tendencies.[6]  For every IQ point lost, it is estimated that a child's lifetime earning capacity will be decreased by $18,000.[7]

17.    In 2012, the National Institute of Environmental Health Services ("NIEHS"), through its Superfund Research Program ("SRP") and NIEHS/EPA Centers for Children's Environmental Health and Disease Prevention Research ("NIEHS/EPA"), added to the growing evidence supporting the regulation of arsenic by establishing that the levels of arsenic consumed in the study were at least two or three times more than the acceptable limits set for drinking water by the U.S. Environmental Protection Agency ("EPA").[8]  Most importantly, the studies showed that baby foods, including rice cereal, contain levels of arsenic that pose a significant risk to the health of babies and children,[9] and identified baby food as a potential source of arsenic exposure.[10]  "Groups at potentially greatest risk are toddlers who are fed a rice syrup-based toddler formula, and potentially people who are following a gluten-free diet."[11]

18.    Infants and children are particularly vulnerable to Toxic Heavy Metals' effects because their organs are still developing.  Exposure to Toxic Heavy Metals during a baby's developmental stage can lead to "'untreatable and frequently permanent brain damage, which may result in 'reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior.'"[12]

---

[6] *Id.*

[7] Martine Bellanger et al., *Economic Benefits of Methylmercury Exposure Control in Europe: Monetary Value of Neurotoxicity Prevention* (Jan. 17, 2013) (https://pubmed.ncbi.nlm.nih.gov/23289875/).

[8] Gilbert-Diamond D, et al., *Rice consumption contributes to arsenic exposure in U.S. women* (Dec. 20, 2011) (https://pubmed.ncbi.nlm.nih.gov/22143778/) (last visited on Sept. 29, 2021).

[9] Jackson BP, Taylor VF, Punshon T, Cottingham KL., *Arsenic concentration and speciation in infant formulas and first foods*. PURE APPL CHEM. 84(2):215-223 (2012) (https://pubmed.ncbi.nlm.nih.gov/22701232/) (last visited on Sept. 29, 2021).

[10] Jackson BP, Taylor VF, Karagas MR, Punshon T, Cottingham KL., *Arsenic, Organic Foods, and Brown Rice Syrup.,* ENVIRON HEALTH PERSPECT (2012); (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3346791/) (last visited on Sept. 29, 2021).

[11] Spivey, A., *Studies find arsenic in food adds up,* National Institute of Environmental Health Services (Mar. 2012) (https://factor.niehs.nih.gov/2012/3/science-arsenic/index.htm) (last visited on Sept. 29, 2021).

[12] **Exhibit A** at p. 9.

19.     The American Academy of Pediatricians ("AAP") and the National Toxicology Program in the National Institutes of Health ("NTP/NIH") both determined that, in young children, "even very low blood lead levels are associated with lower academic achievement, IQ, and greater incidence of attention-related behaviors and problem behaviors."[13]   Peer-reviewed literature further confirms that arsenic exposure is associated with health risks related to developing respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological issues, as well as damaging effects on the central nervous system and cognitive development in children and increased risk of developing ADHD.[14]

20.     Lead exposure presents similar long-term cognitive defects and an increased risk of developing other conditions or disorders.  As recognized by the Congressional Subcommittee, risks of exposure to lead are directly associated with "behavioral problems, decreased cognitive performance, delayed puberty, reduced postnatal growth," and ADHD development.[15]

21.     Cadmium is a known neurotoxin.  Exposure to cadmium increases the risk of developing kidney damage, decreases bone density, and damages the respiratory and skeletal systems.[16]

22.     Mercury, as explained by the WHO, "may have toxic effects on the nervous, digestive, and immune systems, and on lungs, kidneys, skin, and eyes."[17]

---

[13] Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (June 1, 2013) (https://pubmed.ncbi.nlm.nih.gov/23570911/) (emphasis added) (last visited on Sept. 29, 2021).
[14] *See* Environmental Defense Fund, *EDF Report Finds Lead in 1 in 5 Baby Food Samples,* (June 15, 2017) (https://www.edf.org/media/edf-report-finds-lead-1-5-baby-food-samples) (last visited on Sept. 29, 2021).
[15] **Exhibit A** at p. 11.
[16] WHO, *Cadmium,* (2019) (https://www.who.int/ipcs/assessment/public_health/cadmium/en/) (last visited on Sept. 29, 2021).
[17] Laura Reiley, N*ew Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, THE WASHINGTON POST (Feb. 4, 2021), https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/)  (last visited on Sept. 29, 2021).

A.    **There Is No Established Safe Level of Inorganic Arsenic Consumption for Babies.**

23.    Arsenic is classified by the International Agency for Research on Cancer ("IARC") as a Group 1 carcinogen.[18]  Its harmful effects are also recognized by the WHO, which lists arsenic as one of the top ten chemicals of major public concern.  The Agency for Toxic Substances and Disease Registry ("ATSDR") recognizes arsenic as the number one substance to pose the most significant threat to human health.[19]  The inorganic forms of arsenic, referred to as arsenite and arsenate, are water-soluble and found in rice.

24.    The known health hazards associated with arsenic exposure include damage to neurodevelopment, cognitive development, respiratory system, and other neurological and immunological effects.[20]  "Studies have concluded that arsenic exposure has a "significant negative effect on neurodevelopment in children."[21]  The most negative effects are seen in verbal performance and memory.  It is estimated that for every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children."[22]

25.    Published guidelines issued by the WHO permit levels of arsenic in drinking water up to 10 parts per billion ("ppb").  Similarly, the FDA and EPA recognize the harmful effects of arsenic and have set standards limiting consumption levels to 10 ppb.[23]

---

[18] https://monographs.iarc.who.int/list-of-classifications (last visited on Sept. 29, 2021).

[19] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on Sept. 29, 2021).

[20] **Exhibit A** at p. 11.

[21] Miguel Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (June 1, 2013) (https://pubmed.ncbi.nlm.nih.gov/23570911/) (last visited on Sept. 29, 2021).

[22] *Id.*

[23] FDA, *Draft Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants: Action Level* (Apr. 2016) (https://www.govinfo.gov/content/pkg/FR-2016-04-06/pdf/2016-07840.pdf (last visited on Sept. 29, 2021).

26.     In 2020, the FDA issued "Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants" stating that baby food products should not exceed arsenic levels of 100 ppb.[24] However, Defendant often distributes and sell products containing twice the amount of arsenic recommended by the FDA.

**B.     There Is No Established Safe Level of Lead Consumption for Babies.**

27.     IARC classifies lead as a Group 1 carcinogen.[25]  Additionally, the ATSDR lists lead as the second most harmful substance that poses a significant threat to human health.[26]  Lead is also recognized by the WHO as a major public health concern.[27]

28.     Numerous governmental agencies, including the FDA, recognize the significant health effects that lead can have on children and infants.  High levels of lead exposure can seriously harm children's development and health, specifically the brain and nervous system.  Neurological deficits from high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ.  Additionally, because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time.[28]

29.     The EPA, WHO, the Centers for Disease Control and Prevention ("CDC") and the AAP unanimously agree that there is no established "safe level of lead (Pb) in a child's blood; even low levels of Pb in the blood can result in behavior and learning problems, lower IQ and

---

[24] FDA, Guidance for Industry: Action Level for Inorganic Arsenic in Rice Cereals for Infants (Aug. 2020), (https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-level-inorganic-arsenic-rice-cereals-infants)  (last visited on Sept. 29, 2021).
[25] https://monographs.iarc.who.int/list-of-classifications (last visited on Sept. 29, 2021).
[26] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on Sept. 29, 2021).
[27] https://apps.who.int/iris/bitstream/handle/10665/329480/WHO-CED-PHE-EPE-19.4.3-eng.pdf?ua=1 (last visited on Sept. 29, 2021).
[28] FDA, *Lead in Food, Foodwares, and Dietary Supplements* (www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements) (last visited on Sept. 29, 2021).

hyperactivity, slowed growth, hearing problems, and anemia."[29]  Moreover, numerous scientific studies establish a "significant association between early childhood lead exposure and decrease standardized test performance, with lead exposure strongly linked to an adverse effect on academic achievement."[30]  Peer-reviewed studies also establish a significant association between lead exposure and ADHD.[31]

### C.    There Is No Established Safe Level of Cadmium Consumption for Babies.

30.    IARC classifies cadmium as a Group 1 carcinogen.[32]  Additionally, the ATSDR lists cadmium as the seventh most substance to pose the most significant threat to human health.[33] Further, the WHO recognizes cadmium as a major public health concern.[34]

31.    Cadmium has no physiological function in the human body and is a known neurotoxin.  Consumption of cadmium is associated with decrease in IQ and development of ADHD.[35]  Peer-reviewed literature documents the harmful effects cadmium exposure has on children's Full-Scale IQ, particularly in boys, who historically have fewer IQ points than other boys without cadmium exposure.[36]  Moreover, according to a new study led by Harvard University

---

[29] Congressional Report at p. 10; *see also*, Valerie Zartarian, et al., *Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making* (Sept. 12, 2017) (https://ehp.niehs.nih.gov/doi/10.1289/ehp1605) (last visited on Sept. 29, 2021); https://www.epa.gov/lead/learn-about-lead; *see also*, Philippe Grandjean, *Even Low-Dose Lead Exposure Is Hazardous* (Sept. 11, 2010) (https://pubmed.ncbi.nlm.nih.gov/20833288/).
[29] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (last visited on Sept. 29, 2021).
[30] **Exhibit A** at p. 11 (internal citation omitted).
[31] *Id.*
[32] https://monographs.iarc.who.int/list-of-classifications (last visited on Sept. 29, 2021).
[33] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on Sept. 29, 2021).
[34] https://apps.who.int/iris/bitstream/handle/10665/329480/WHO-CED-PHE-EPE-19.4.3-eng.pdf?ua=1 (last visited on Sept. 29, 2021).
[35] *Id.* at p. 12.
[36] *Id.*

researchers, children with higher cadmium levels are three times more likely to have learning disabilities and participate in special education.[37]

32.     Despite well-known adverse health effects, the FDA fails to regulate levels of cadmium in Baby Food Products, allowing Gerber to set its own limits, which dangerously exceed levels safe for consumption.

## II.     GERBER'S BABY FOOD PRODUCTS CONTAIN DANGEROUS LEVELS OF TOXIC HEAVY METALS.

### A.     Gerber's Baby Food Products Contain Arsenic.

33.     The Congressional Report states: "Internal company test records obtained by the Subcommittee confirm that all responding baby food manufacturers sold baby foods tainted by high levels of Toxic Heavy Metals."[38]

34.     There is no established safe level for inorganic arsenic consumption by babies.  The FDA, EPA, WHO, and European Union ("EU") have all set a maximum level of inorganic arsenic at 10 ppb.  Accordingly, the Congressional Subcommittee took this value into consideration during their analysis.[39]

35.     Health experts, including the AAP, Consumer Reports, and the Environmental Defense Fund ("EDF"), all advocated for a maximum level of 1 ppb instead of 10 ppb.  EDF is the world's leading nonprofit environmental group that focuses on environmental health hazards. Consumer Reports is a nonprofit organization that advocates for consumers and regarding Toxic Heavy Metals.

---

[37] Marla Cone, *Is Cadmium as Dangerous for Children as Lead?,* SCIENTIFIC AMERICAN (Feb. 2012), (https://www.scientificamerican.com/article/is-cadmium-as-dangerous-for-children-lead/) (last visited on Sept. 29, 2021).
[38] **Exhibit A** at p. 13.
[39] *Id.*

36.    Gerber does not regularly test its finished products for arsenic and instead only tests its ingredients.[40]

37.    Gerber routinely used ingredients containing over 90 ppb inorganic arsenic in its Baby Food Products.[41]

38.    The Congressional Report determined Gerber used ingredients in its Baby Food Products after testing results revealed that the ingredients contained as high as 98 ppb inorganic arsenic.[42]

39.    The below chart illustrates the ingredients containing the highest levels of arsenic that Gerber used in its Baby Food Products, according to Gerber's test results:

---

[40] *Id.* at p. 56; Letter from the Chief Executive Officer of Gerber Products Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 19, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/7_Redacted.pdf) (Gerber's policy is to "regularly test our ingredients, and periodically test… finished goods").
[41] *Id.* at p. 19.
[42] *Id.*

*Gerber Products Company Test Results (Excerpted Entries)*[49]

| Year | Ingredient | Total Arsenic (ppb) | Inorganic Arsenic (ppb) |
|------|-----------|---------------------|-------------------------|
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |

40.     Testing of Gerber's ingredients shows that the company used at least five batches of rice flour that had 98 ppb inorganic arsenic, and 67 batches that contained more than 90 ppb – nearly 10 times the maximum level of inorganic arsenic for drinking water set by the EPA.[43]

**B.     Gerber's Baby Food Products Contain Lead.**

41.     There is no federal standard for lead in baby food.  However, standards for the levels of lead in drinking water have been imposed by agencies, including the FDA (limit of 5 ppb) and EPA (15 ppb).  The FDA also provides guidance for lead measurements in juice and candy

---

[43] *Id.*

with a maximum level of 100 ppb.[44]  Additionally, WHO provides that levels of lead in drinking water should not exceed 5 ppb.

42.     Health experts, including the AAP, Consumer Reports, and the EDF advocated for a maximum limit of 1 ppb in baby food.[45]

43.     The Congressional Subcommittee used the following guidance when reviewing baby food manufacturers' internal test results:

*Proposed and Existing Lead Standards*

| Group or Agency | Standard |
|---|---|
| Environmental Defense Fund | 1 ppb, especially for baby food |
| Consumer Reports | 1 ppb in fruit juices |
| American Academy of Pediatrics (AAP) | 1 ppb for water fountains in schools |
| FDA | 5 ppb for bottled water |
| World Health Organization | 10 ppb provisional guideline |
| EPA | 15 ppb for drinking water (action level) |
| European Union (EU) | 20 ppb for "infant formulae and follow-on formulae" |
| FDA | 50 ppb for juice<br>100 ppb for candy |

44.     Gerber does not test its finished products for lead, it only tests its ingredients.[46]

45.     Internal testing data from Gerber demonstrates that Gerber used ingredients containing significant amounts of lead in its Baby Food Products.[47]

46.     The Congressional Report determined that Gerber used an ingredient, conventional sweet potatoes, which contained 48 ppb lead — nearly ten times the maximum level of lead in

---

[44] **Exhibit A** at p. 22.
[45] *Id.*
[46] *Id.*
[47] *Id.* at p. 27.

bottled water allowed by the FDA — in its Baby Food Products.  Gerber also used twelve other batches of sweet potato that tested over 20 ppb for lead.[48]

47.     Although Gerber produced limited testing results to the Congressional Subcommittee, the testing results revealed that the average amount of lead in Gerber's juice concentrates was 11.2 ppb.  Additionally, over 83% of the juice concentrates tested showed greater than 1 ppb lead.[49]

48.     The below chart illustrates the ingredients containing the highest levels of lead that Gerber used in its Baby Food Products, according to Gerber:

*Gerber Products Company Test Results (Excerpted Entries)*[65]

| Year | Ingredient | Lead Level (ppb) |
| --- | --- | --- |
| 2017 | Conventional | 48 |
| 2017 | Organic | 35 |
| 2017 | Organic | 34 |
| 2017 | Organic | 34 |
| 2018 | Conventional | 34 |
| 2019 | Conventional | 34 |
| 2019 | Conventional | 34 |
| 2018 | Organic | 25 |
| 2019 | Organic | 25 |
| 2018 | Organic | 22 |
| 2018 | Organic | 22 |
| 2018 | Organic | 21 |
| 2019 | Conventional | 21 |

**C.     Gerber's Baby Food Products Contain Cadmium.**

49.     There is no federal standard for cadmium in baby food.  Standards for cadmium levels in drinking water have been imposed by both the FDA and the EPA.  Both agencies impose a limit of 5 ppb.[50]  Additionally, WHO imposes a limit of 3 ppb.

---

[48] *Id.* at 28.
[49] *Id*.
[50] *Id*. at p. 29.

50.     Nonprofit organizations have also issued recommendations.  Consumer Reports recommends a limit of 1 ppb for cadmium in fruit and juices, while Healthy Babies Bright Futures suggests 0 ppb.[51]  Consumer Reports and the EDF, advocate for levels of less than 1 ppb.[52]

51.     The Congressional Subcommittee used the following guidance when reviewing Defendant's internal test results:

**Proposed and Existing Cadmium Standards**

| Group or Agency | Standard |
| --- | --- |
| Consumer Reports | 1 ppb in all fruit juices |
| World Health Organization | 3 ppb for drinking water |
| EPA | 5 ppb for drinking water |
| FDA | 5 ppb for drinking water |
| European Union (EU) | 5-20 ppb for infant formulae |

52.     Gerber does not test all its ingredients for Cadmium.  Of the ingredients that Gerber does test, the test results demonstrate that Gerber sold products containing amounts of cadmium that significantly exceed existing standards.[53]

53.     Specifically, the testing results revealed that Gerber used multiple batches of carrots containing as much as 87 ppb cadmium.  Moreover, 75% of the carrots Gerber used had more than 5 ppb cadmium.[54]

54.     The below chart illustrates the ingredients containing the highest levels of cadmium that Gerber used in its Baby Food Products, according to Gerber:

---

[51] *Id.*
[52] *Id.*
[53] *Id.* at p. 32.
[54] *Id.*

*Gerber Products Company Test Results (Excerpted Entries)*[79]

| Year | Ingredient | Supplier | Arsenic (ppb) | Cadmium (ppb) | Mercury (ppb) | Lead (ppb) |
|------|-----------|----------|---------------|---------------|---------------|------------|
| 2018 | Conventional | Supplier 1 | | 37 | | |
| 2018 | Conventional | Supplier 4 | | 53 | | |
| 2019 | Conventional | Supplier 4 | | 42 | | |
| 2017 | Conventional | Supplier 1 | <2 | 40 | <1 | 4 |

## III.   GERBER DISREGARDED AND IGNORED REPORTS DETECTING THE PRESENCE OF TOXIC HEAVY METALS IN ITS BABY FOOD PRODUCTS.

55.    For years, Gerber has possessed medical and scientific data linking childhood exposure to Toxic Heavy Metals to long-term and irreversible health and cognitive issues.

56.    On December 6, 2017, Happy Babies Bright Futures issued a report finding rice-based infant cereals, including Gerber's cereals, contained 84% more arsenic than non-rice multigrain products ("Arsenic Report").[55]

57.    In 2017, EDF issued a report finding lead in 1 in 5 samples of baby food.  The EDF based its analysis on data from 2,164 baby food samples collected by the FDA between 2003 and 2013[56] as part of the agency's Total Diet Study ("TDS") program, which has monitored the United States population's average annual dietary intake of levels of certain contaminants and nutrients since the 1960s.[57]  Overall, the EDF "found that more than 1 million children consume more lead than FDA's limit" and estimated that the removal of lead in baby food "would save society more

---

[55] Healthy Babies Bright Futures, *Arsenic in 9 Brands of Infant Cereal* (Dec. 2017) (https://www.healthybabycereals.org/sites/healthybabycereals.org/files/2017-12/HBBF_ArsenicInInfantCerealReport.pdf) (last visited on Sept. 29, 2021).
[56] Environmental Defense Fund, *Lead in food: A hidden health threat* (June 15, 2017) (https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf) (last visited Sept. 29, 2021).
[57] To conduct TDS, the FDA purchases samples of diverse types of foods four times a year, in different regions of the United States.  The food samples are prepared in the same manner consumers typically would and analyze for levels of chemical contaminants and chemical elements, including Toxic Heavy Metals.  The FDA uses the results to calculate the estimated consumption of each contaminant and nutrient annually.  Results of the TDS, from 1991 to present, are publicly available on the FDA's website (https://www.fda.gov/food/total-diet-study/total-diet-study-fact-sheet-industry)

than \$27 billion annually in total lifetime earnings from saved IQ points."[58]   The EDF also recommended that manufacturers set a goal of less than 1 ppb of lead in baby food and test more frequently during processing to identify additional lead sources and take appropriate corrective actions.

58.     On August 16, 2018, Consumer Reports revealed the findings of its analysis of 50 nationally distributed baby food products manufactured by Gerber and several other manufacturers.  Consumer Reports found measurable levels of Toxic Heavy Metals in all 50 products, noting that about two-thirds (68%) contained concerning amounts of at least one Toxic Heavy Metals, and 15 of the foods posed a potential health risk to a child who ate one serving of the product or less, per day.  The results further established "all the samples of … Gerber Turkey & Rice had concerning levels of lead."[59]

59.     In April 2019, Healthy Babies Bright Futures published a report finding that 95% of the products tested contained dangerous amounts of Toxic Heavy Metals.[60]  Notably, Healthy Babies Bright Futures' Report found Toxic Heavy Metals in the same Baby Food Products at issue in this case, among others.  For example, Gerber's Whole Wheat Whole Grain Cereal – Sitter 2nd Foods contained significant levels of arsenic, lead, and cadmium.[61]

60.     The Healthy Babies Bright Futures Report results are consistent with the FDA's findings in 2017, in which the FDA detected one or more Toxic Heavy Metal in 33 of 39 baby food samples.[62]  Additionally, while the FDA proposed limiting inorganic arsenic in infant rice

---

[58] Environmental Defense Fund, *Lead in food: A hidden health threat* (June 15, 2017) (https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf) (last visited Sept. 29, 2021).
[59] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know* (Aug. 16, 2018) (https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/) (last visited on Sept. 29, 2021).
[60] Healthy Babies Bright Futures, *What's in my Baby's Food?*  (Dec. 2017) (https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf) (last visited on Sept. 29, 2021).
[61] *Id*. at 19.
[62] *Id.* at 6.

cereals to 100 ppb, the Healthy Babies Bright Futures report noted that four of the seven infant rice cereals they analyzed during its study detected amounts exceeding 100 ppb.[63]

## IV.    GERBER'S ADVERTISEMENTS FALSELY CLAIM THAT ITS BABY FOOD PRODUCTS ARE SAFE, AND FRAUDULENTLY OMIT ALL MATERIAL INFORMATION ABOUT TOXIC HEAVY METALS

61.    Defendant manufactures, distributes, and sells food for babies such as traditional baby food purees, baby cereals, puffs, and rice cakes.

62.    Defendant proudly promises that, "[t]he health and safety of your little one has been and will always be our highest priority."[64]  Moreover, the company slogan is "Anything for Baby."



63.    Gerber uniformly markets, advertises, represents, and warrants its products are safe and suitable for babies' consumption.  Gerber's "Commitment to Quality" statement states, "Good enough is never enough.  We meet the standards of the FDA, but we don't stop there.  We go further.  We have among the strictest standards in the world.  From farm to highchair, we go through over 100 quality checks for every jar."[65]

64.    Gerber markets and advertises Gerber "Single Grain Rice Cereal" as containing ingredients that "support brain development."  The following image is a representative example of this product.

---

[63] *Id.*
[64] https://www.gerber.com/commitment-to-quality (last visited on Sept. 29, 2021).
[65] *Id.*




65. Despite unequivocal proof of Toxic Heavy Metals in its Baby Food Products, Gerber continues to mislead its customers. Below is Gerber's response to the Congressional Report's findings:

## An Important Message From Gerber

February 18, 2021

At Gerber, babies are our highest priority. Parents can rest assured our products are healthy and safe.

The standards we have in place for the safety and quality of our baby foods are industry-leading, and among the strictest in not just the U.S., but the world. We meet the standards of the FDA, but we don't stop there. We meet or exceed all existing government requirements, and where they don't currently exist, we have established our own high standards based on the latest food safety guidance.Gerber foods receive thorough oversight at all levels of the growing and the production process.

Heavy metals occur naturally in the soil and water in which crops are grown. As stated in our 2019 response to the Congressional Inquiry, we take many steps to minimize their presence. We prioritize growing locations based on climate and soil composition. We approve fields before crops are planted based on soil testing. We rotate crops according to best available science. Throughout the process we test produce, water, ingredients and our foods to ensure we are delivering on our promise to deliver high-quality and tasty baby food. From farm to highchair, we go through over 100 quality checks for every jar.

66. Defendant incorrectly represents that its Baby Food Products are safe for consumption.

67. Gerber misleads consumers by representing that the company "meets the standards of the FDA," however, as noted in the Congressional Report, Gerber manufactures, markets and sells products containing ingredients with levels of Toxic Heavy Metals in excess of the FDA standards.[66]

68. Gerber fails to disclose to the consumer that it has adopted a reckless policy that only tests ingredients used in products rather than the finished product.

---

[66] **Exhibit A** at pp. 31, 37-38.

69.     Consumers reasonably rely upon Gerber's statements, representations, and advertisements regarding the safety of its product.  They would have no reason to suspect the presence of Toxic Heavy Metals in Gerber products or take necessary precautions.

## V.     GERBER CONTINUES TO MISLEAD CONSUMERS

70.     On September 29, 2021, the Congressional Subcommittee released a new Staff Report summarizing recent developments since the release of the original Congressional Report.[67]

71.     The Second Congressional Report revealed that (i) dangerous levels of Toxic Heavy Metals are in even more baby foods, and (ii) Gerber has failed to take any action to protect consumers.[68]

### A.     The Second Congressional Report Showed that Even More of Gerber's Baby Foods Contain Dangerous Levels of Toxic Heavy Metals

72.     The Second Congressional Report found that "Gerber's organic rice cereal is dangerous."[69]

73.     Through its Laboratory Flexible Funding Model Cooperative Agreement Program, the FDA provides funding to state laboratories to conduct sample testing to "strengthen FDA's efforts to minimize foodborne exposure."[70]

74.     Following the release of the Congressional Report, Alaska's Department of Environmental Health Laboratory collected Gerber infant rice cereal samples for inorganic arsenic testing on March 31, 2021; April 7, 2021; and April 27, 2021.[71]

---

[67] Staff Report, Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods (hereinafter referred to as the "Second Congressional Report") (Sept. 29, 2021) (https://oversight.house.gov/sites/democrats.oversight.house.gov/files/ECP%20Second%20Baby%20Food%20Repo rt%209.29.21%20FINAL.pdf) (last visited on Oct. 5, 2021), attached hereto as **Exhibit B**.
[68] **Exhibit B** at 1.
[69] *Id.* at 3.
[70] *Id*. at 5.
[71] *Id.*

75.    Testing of Gerber's baby food products revealed that like its competitor, Beech-Nut, "Gerber was also selling tainted baby food."[72]  Specifically, Gerber's Rice Cereal averaged 87.43 ppb inorganic arsenic.[73]

76.    Gerber's test results show two samples exceeding FDA's current 100 ppb inorganic arsenic limit, and many just below that level.  The Gerber Rice Cereal that tested *lowest* in inorganic arsenic contained ten times the limit on inorganic arsenic set by the WHO for drinking water.[74]

**B.     Gerber Has Failed to Take Any Action to Protect Consumers.**

77.    The Second Congressional Report explained that, "[b]ased on the similarities between Gerber's and Beech-Nut's test results, and the identical reporting timeline, there is no excuse for Gerber's delay in recalling its dangerous products."[75]

78.    In May and June 2021, Alaska's Department of Environmental Health Laboratory provided the FDA with several batches of testing data on Beech-Nut and Gerber baby foods. Testing results of each batch revealed "that Gerber products presented at least as much danger to babies as Beech-Nut products."[76]

79.    Specifically, On May 6, 2021, Alaska provided Beech-Nut Rice Cereal test results to the FDA.  The Beech-Nut samples averaged 67.2 ppb inorganic arsenic and two samples exceeded 100 ppb inorganic arsenic.  The same day, Alaska also provided Gerber Rice Cereal test results to the FDA.  The Gerber samples averaged 87.8 ppb inorganic arsenic and one sample exceeded 100 ppb inorganic.[77]

---

[72] *Id.* at 12.
[73] *Id.*
[74] *Id.*
[75] *Id.* at 13
[76] *Id.*
[77] *Id.* at 14

80.     While Beech-Nut recalled some of its products and completely discontinued sales of its rice cereal, Gerber has taken no such actions to protect consumers.[78]

81.     On June 8, 2021, fifteen days after Alaska's last report, Beech-Nut announced its action recalling some of its infant rice cereal and discontinuing sales of the product.[79]

82.     As of today, more than 120 days after Alaska's last report Gerber has taken no action to protect babies that could be harmed by its products.[80]

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Class:

> **Class**: All persons who purchased one or more of Defendant's products containing Toxic Heavy Metals, in the United States for personal/household use.[81]

84.     Plaintiff seeks certification on behalf of the following New Jersey Subclass.[82]

> **New Jersey Subclass**:  All persons residing in New Jersey who purchased one of more of Defendant's products containing Toxic Heavy Metals for personal/household use.

85.     **Excluded from the Class are**: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) the Defendant, Defendant's subsidiaries, parents, successors, predecessors, any entities in which the Defendant has a controlling interest, and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

---

[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] Plaintiff reserves the right to re-define the Class definition prior to class certification and after having the opportunity to conduct discovery.
[82] As described above, the Nationwide Class and Subclass are collectively to as "Class" unless otherwise noted.  *See* n.2.

86.   **Numerosity (Rule 23(a)(1))**:   The exact number of members of the Class is unknown and currently unavailable to Plaintiff, but joinder of individual members herein is impractical.  The Class is likely comprised of hundreds of thousands of consumers.  Sales figures indicate that millions of individuals purchased Gerber's Baby Food Products.  The precise number of Class members, and their addresses, is unknown to Plaintiff at this time, but can be ascertained from Defendant's records and/or retailer records.  The members of the Class may be notified of the pendency of this action by mail or email, internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

87.   **Predominant Common Questions (Rule 23(a)(2))**:   The Class' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  The common and legal questions include, without limitation:

a.    Whether Defendant knew or should have known that its Baby Food Products contained Toxic Heavy Metals that rendered Defendant's Baby Food Products unsafe for babies;

b.    Whether Defendant wrongfully represented and continues to represent that its Baby Food Products are safe for babies' consumption;

c.    Whether Defendant's representations, advertisements, warranties, labeling, packaging, and logos are false, deceptive, and misleading;

d.    Whether Defendant had knowledge that those representations were likely to deceive a reasonable consumer;

e.    Whether Defendant had knowledge that those representations were false, deceptive, or misleading;

f.   Whether Defendant continue to disseminate those false, misleading, and deceptive representations;

g.   Whether Defendant failed to warn and disclose material facts regarding its Baby Food Products and concealed internal testing results revealing dangerous levels of arsenic, lead, cadmium, mercury, and other heavy metals that are unsafe for babies;

h.   Whether Defendant's testing showed that Defendant's products contained Toxic Heavy Metals;

i.   Whether Defendant violated the laws of the State of New Jersey;

j.   Whether Defendant violated the state consumer protection statutes alleged herein;

k.   Whether Defendant was unjustly enriched; and

l.   The nature of relief, including damages and equitable relief, to which Plaintiff and members of the Class are entitled.

88.   **Typicality of Claims (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other Class members, purchased Defendant's Baby Food Products, suffered damages as a result of that purchase, and seeks the same relief as the proposed Class members.

89.   **Adequacy of Representation (Rule 23(a)(4))**: Plaintiff adequately represents the Class because her interests do not conflict with the interests of the members of the Class, and she has retained counsel competent and experienced in complex class action and consumer litigation.

90.   Plaintiff and her counsel will fairly and adequately protect the interest of the members of the Class.

91.   **Superiority (Rule 23(b)(3))**: A class action is superior to other available means of adjudication for this controversy.  It would be impracticable for members of the Class to

individually litigate their own claims against Defendant because the damages suffered by Plaintiff and the members of the Classes are relatively small compared to the cost of individually litigating their claims.  Individual litigation would create the potential for inconsistent judgments and delay and expenses to the court system.  A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

### Declaratory Relief
### (Fed. R. Civ. P. 23(b)(1) and (2))

92.     In the alternative, this action may properly be maintained as a class action because:

a.    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendant; or

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

### Issue Certification (Fed. R. Civ. P. 23(c)(4))

93.     In the alternative, the common questions of fact and law, set forth in Paragraph 87 are appropriate for issue certification on behalf of the proposed Class.

## CAUSES OF ACTION

### COUNT  I
### BREACH OF EXPRESS WARRANTY
*(On behalf of Plaintiff and the Class against Defendant)*

94.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as fitfully set forth here.

95.     Plaintiff brings this claim on behalf of herself and members of the Class.

96.     Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain.  Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description.

97.     Plaintiff and members of the Class formed a contract with the Defendant at the time they purchased Defendant's Baby Food Products.  The terms of that contract included the promises and affirmations of fact that Defendant made through its product labels, through other forms of uniform, nationwide marketing, its website, and on social media.  Among other affirmations of fact and promises described herein, Defendant represented that its Baby Food Products were and are safe, healthy, and appropriate for infant or child consumption.

98.     These affirmations of facts and promises, which are part of Defendant's uniform marketing, advertising, and product labeling, constitute express warranties and became part of the basis of the bargain, and they are part of the standardized contracts between Plaintiff and members of the Class on the one hand, and the Defendant, on the other.

99.     Contrary to these affirmations of fact and promises, Defendant's Baby Food Products did not and do not contain ingredients that are safe, healthy, and appropriate for infant or

child consumption as described on the product labels or in Defendant's marketing and advertising campaign.

100.   Defendant breached the express warranties and/or contract obligations by placing these Baby Food Products into the stream of commerce and selling them to consumers, when they have dangerous and/or Toxic Heavy Metals, and can cause toxicity or adverse health implications, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Defendant.  The high levels of Toxic Heavy Metals substantially impair the use, value, and safety of Defendant's Baby Food Products.

101.   At all times relevant herein, Defendant was aware, or should have been aware, of Toxic Heavy Metals in Defendant's Baby Food Products.  Defendant was on notice of these concerns with its products, but nowhere on the package labeling or on Defendant's website or other marketing materials did Defendant warn Plaintiff and members of the Class that they were at risk of feeding their children food with levels of Toxic Heavy Metals that exceed the standards set by federal agencies or recommended by other organizations.

102.   Instead, Defendant concealed the high levels of heavy metals contained in Defendant's Baby Food Products and deceptively represented that these products were safe, healthy, and appropriate for infant or child consumption.  Defendant, thus, utterly failed to ensure that the material representations it was making to consumers were true.

103.   The toxic and/or dangerous levels of heavy metals at issue in Defendant's Baby Food Products existed when they left Defendant's possession or control and were sold to Plaintiff and members of the Class.  The levels of heavy metals contained in the Defendant's Baby Food Products were undiscoverable by Plaintiff and members of the Class at the time of purchase of Defendant's Baby Food Products.

104.     As a manufacturer, marketer, advertiser, distributor, and seller of Defendant's Baby Food Products, Defendant has exclusive knowledge and notice of the fact that these products did not conform to the affirmations of fact and promises.

105.     In addition, or in the alternative, to the formation of an express contract, Defendant made each of the above-described representations to induce Plaintiff and members of the Class to rely on such representations.

106.     Defendant's affirmations of fact and promises were material, and Plaintiff and members of the Class reasonably relied upon such representations in purchasing the Defendant's Baby Food Products.

107.     Affording Defendant an opportunity to cure its breaches of written warranties would be unnecessary and futile here.  Defendant was placed on reasonable notice of the levels of heavy metals in Defendant's Baby Food Products and breach of the warranties based on its scientific research and expertise in the food production industry.  Defendant has had ample opportunity to cure the high level of heavy metals in its Baby Food Products to render them safe and healthy consumption by Plaintiff and members of the putative classes and their children but has failed to do so.

108.     Defendant has also had notice of its breach as set forth herein by virtue of the recent Congressional investigation into this matter and the prior 2019 report issued by Healthy Babies Bright Future.

109.     As a direct and proximate result of Defendant's breaches of express warranty, Plaintiff and members of the Class have been damaged because they did not receive the products as specifically warranted by Defendant.  Plaintiff and members of the Class did not receive the

benefit of the bargain and suffered damages at the point of sale stemming from their overpayment of Defendant's Baby Food Products.

**COUNT  II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
*(On behalf of Plaintiff and the Class against Defendant)*

110.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

111.    Plaintiff brings this claim on behalf of herself and members of the Class.

112.    Defendant is a merchant engaging in the sale of goods to Plaintiff and members of the Class.

113.    There was a sale of goods from Defendant to Plaintiff and members of the Class.

114.    Defendant's Baby Food Products were sold to Plaintiff and members of the Class purchased Defendant's Baby Food Products from authorized resellers of Defendant's Baby Food Products.

115.    By placing Defendant's Baby Food Products into the stream of commerce, Defendant impliedly warranted to Plaintiff and members of the Class that Defendant's Products were of merchantable quality (i.e., a product of high-enough quality to make it fit for sale, usable for the purpose it was made, of average worth in the marketplace, or not contaminated or flawed or containing a defect affecting the safety of the product), would pass without objection in the trade or business, and were free from material defects, and reasonably fit for the use for which they were intended.

116.    Defendant's products when sold, and at all times thereafter, were not merchantable or reasonably fit for either the use they were intended or the uses reasonably foreseeable by Defendant.

117.    Defendant breached the implied warranty of merchantability because Defendant's Baby Food Products suffer from the presence of Toxic Heavy Metals, such as arsenic, lead, cadmium, and mercury, which have the propensity to cause health complications, rendering them unfit for their intended use and purpose as baby and/or children's food and beverages. The level of Toxic Heavy Metals substantially impairs the use, value, and safety of these products.

118.    The toxic and/or dangerous levels of heavy metals existed when the Defendant's Baby Food Products left Defendant's possession or control and were sold to Plaintiff and members of the putative classes. The amounts of Toxic Heavy Metals contained in Defendant's Baby Food Products were undiscoverable by Plaintiff and members of the putative classes at the time of their purchase.

119.    As described herein, Defendant advertised on its Baby Food Product labels, on its website, and through a national advertising campaign, among other means, that Defendant's Baby Food Products were and are safe and appropriate for infant and child consumption.

120.    Contrary to these representations, Defendant's Baby Food Products possessed dangerous levels of Toxic Heavy Metals which were not revealed on Defendant's Baby Food Products, the corresponding product labels, or in Defendant's marketing and advertising campaigns. Rather, Defendant's Baby Food Products are unsafe because they have dangerous levels of Toxic Heavy Metals. The Baby Food Products are unsafe and unsuitable for consumer use as marketed by Defendant. Defendant has exclusive knowledge of material facts concerning the defective nature of Defendant's Baby Food Products.

121.    Plaintiff and members of the Class, at all relevant times, were intended third-party beneficiaries of Defendant and its agents in the distribution and sale of Defendant's Baby Food Products. Moreover, Defendant exercises substantial control over which outlets can carry and sell

Defendant's Baby Food Products, which are the same places that Plaintiff and members of the Class purchased them.  In addition, Defendant's warranties are in no way designed to apply to the distributors that purchase these products in bulk and then sell them on an individual basis to each consumer.  Individual consumers are the ones who ultimately review the labels prior to making their purchasing decisions.  As a result, these warranties are specifically designed to benefit the individual consumers who purchase Defendant's Baby Food Products.

122.    Plaintiff and members of the Class sustained damages as a direct and proximate result of Defendant's breaches insofar as they paid a premium for Defendant's Baby Food Products that they would not have otherwise paid had they known that Defendant's Baby Food Products contained dangerous levels of Toxic Heavy Metals.

123.    Plaintiff and members of the Class did not receive the value of the product they paid for.  The products are worthless or worth far less than Defendant represents due to the presence of Toxic Heavy Metals contained therein which have the propensity to cause adverse health implications.

124.    Plaintiff and members of the Class have sustained, are sustaining, and will sustain damages if Defendant continues to engage in such deceptive, unfair, and unreasonable practices.

125.    Defendant was placed on reasonable notice of the high levels of Toxic Heavy Metals contained in Defendant's Baby Food Products and its breach of the warranties based on its own research into food processing and sourcing, as well as a recent Congressional investigation on the matter.  Defendant has had ample opportunity to cure the dangerous levels of Toxic Heavy Metals for Plaintiff and members of the Class but have failed to do so.  Instead, Defendant doubled down on efforts to convince consumers that its Baby Food Products are safe to consume and

healthy for babies and children, including public statements denying that there are any issues with its Baby Food Products.

126.    As a result of the breach of the implied warranty of merchantability, Plaintiff and members of the Class are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and other relief as deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

**COUNT  III**
**NEGLIGENT MISREPRESENTATION**
*(On behalf of Plaintiff and the Class against Defendant)*

127.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

128.    Plaintiff brings this claim on behalf of herself and the Class.

129.    Defendant directly, or through its agents and employees, made false representations, concealments, and non-disclosures to Plaintiff and members of the Class about its products' safety and testing.

130.    Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and members of the Class to purchase Defendant's Baby Food Products.

131.    In making these false, misleading, and deceptive representations and omissions, Defendant knew that consumers would purchase its products. Defendant intended for these statements to induce consumers to purchase its Baby Food Products.  Consumers who purchased Defendant's Baby Food Products paid a premium for these products over what consumers would have paid had Defendant disclosed that its Baby Food Products contained dangerous levels of Toxic Heavy Metals.

132. Defendant created a special relationship with Plaintiff and members of the Class through representations regarding its product safety and the Defendant's rigorous, scientific testing and research.

133. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive statements, representations, and omissions, Defendant injured Plaintiff and members of the Class in that they purchased, paid a premium price for, and fed their children the Baby Food Products, which were not as represented.

134. In making the misrepresentations of fact and omissions to Plaintiff and members of the Class, Defendant has failed to fulfill its duty to disclose material facts about its Baby Food Products.

135. The failure to disclose the true nature of the products' safety, testing, and compliance with internal safety thresholds was caused by Defendant's negligence and carelessness.

136. Defendant, in making these misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the misrepresentations were not true.

137. Defendant made and intended the misrepresentations to induce the reliance of Plaintiff and Class members.

138. Defendant allowed its packaging, labels, advertisements, promotional materials, and website to intentionally mislead consumers, such as Plaintiff and members of the Class.

139. Plaintiff and members of the Class did in fact rely on these misrepresentations and purchased Defendant's Baby Food to their detriment. Given the deceptive manner in which Defendant advertised, represented, and otherwise promoted the Baby Food Products, Plaintiff's and members of the Class's reliance on Defendant's misrepresentations was justifiable.

140.     As a direct and proximate result of Defendant's conduct, Plaintiff and members of the Class have suffered actual damages.  Plaintiff and members of the Class purchased products that are worth less than the price they paid, and they would not have purchased Defendant's Baby Food Products at all had they known of the presence, or risk of the presence of Toxic Heavy Metals in the Baby Food Products that do not conform to the products' labels, packaging, advertising, and statements.

141.     Plaintiff and members of the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

**COUNT  IV**
**UNJUST ENRICHMENT**
***(On behalf of the Plaintiff and the Class against Defendant)***

142.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

143.     Plaintiff brings this claim on behalf of herself and the Class.

144.     Plaintiff and the other members of the Class conferred benefits on Defendant by purchasing the Defendant's Baby Food Products.

145.     Defendant received the benefits to the detriment of Plaintiff and the other members of the Class because Plaintiff and the other members of the Class purchased a mislabeled product that is not what they bargained for and did not provide the advertised benefit.

146.     Defendant has been unjustly enriched in retaining the revenues derived from the purchases of Defendant's Baby Food Products by Plaintiff and the other members of the Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to

Plaintiff and the other members of the Class, because they would have not purchased Defendant's

Baby Food Products had they known that they contained dangerous levels Toxic Heavy Metals.

147.    Because Defendant's retention of the non-gratuitous benefits conferred on it by

Plaintiff and the other members of the putative classes is unjust and inequitable, Defendant must

pay restitution to Plaintiff and all members of the putative classes for unjust enrichment, as ordered

by the Court.

**COUNT V**
**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. § 56:8-1, et. seq.**
*(On behalf of the Plaintiff and the Class, or alternatively, on behalf of Plaintiff and the New*
*Jersey Subclass, against Defendant)*

148.    Plaintiff incorporates by reference all allegations in this Complaint and restates

them as if fully set forth herein.

149.    Defendant's representations related to the Baby Food Products, as described herein,

are advertisements as defined by N.J. Stat. Ann. § 56:8-1(a).

150.    The Baby Food Products sold by Defendant is merchandise as defined in N.J. Stat.

Ann. § 56:8-1(c).

151.    Defendant is a person as defined in N.J. Stat. Ann. § 56:8-1(d).

152.    Defendant misrepresented the true quality and ingredients of the Baby Food

Products. The false statements regarding the quality and ingredients were untrue, misleading, and

deceptive, inducing Plaintiff and other consumers to spend more for Baby Food Products that have

lower quality than represented.

153.    The misrepresented quality and ingredients of the Baby Food Products is a material

fact to Plaintiff and other consumers because it is directly related to quality, and because Defendant

recognize the materiality as evidenced by their prominent placement on Defendant's labels, packaging, and advertising.

154.     Defendant failed to disclose the presence of risk of heavy metals in the Baby Foods Products.  These were material facts that Defendant omitted from the packaging of the Baby Food Products.  Consumers, including Plaintiff and the Class, would not have paid as much for the Baby Food Products had Defendant accurately disclosed the quality and ingredients of the Baby Food Products.  Nor could Defendant charge as much for such baby foods, as the quality and ingredients are directly related to the amount of money retailers are able to charge for baby foods.

155.     Defendant placed the false quality in labels, packaging, and advertising related to the Baby Food Products, intending that consumers would rely on those misrepresentations and purchase the Baby Food Products from Defendant.  Plaintiff and the Class were harmed by Defendant's misrepresentations and purchased the Baby Food Products.  Had Defendant disclosed the true quality and contents, Plaintiff and members of the Class would not have purchased the Baby Food Products or would not have been willing to pay as much for the Baby Food Products.

156.     Plaintiff members of the Class have suffered an ascertainable loss by paying more than they would have otherwise paid – and more than Defendant would have been able to charge – for the Baby Food Products and by receiving Baby Food Products with lower quality than they were promised by Defendant and thus being denied the benefit of their bargain.

157.     As a direct and proximate result of the deceptive, fraudulent, misleading, unfair, and unconscionable practices of the Defendant set forth above, Plaintiff and the Class members are entitled to a refund of all moneys acquired by Defendant for violations of N.J. Stat. Ann. § 56:8-1, any other applicable legal or equitable relief, and treble damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and the proposed Class, prays for relief and judgment against Defendant as follows:

a. Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

b. Awarding Plaintiff and the Class compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c. Awarding Plaintiff and the Class appropriate relief, including actual and statutory damages;

d. For punitive damages;

e. For declaratory and equitable relief, including restitution and disgorgement;

f. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

g. Awarding Plaintiff and the Class the costs of prosecuting this action, including expert witness fees;

h. Awarding Plaintiff and the Class reasonable attorneys' fees and costs as allowable by law;

i. Awarding pre-judgment and post-judgment interest; and

j. Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  October 18, 2021                    Respectfully submitted,

                                            */s/ Steven J. Toll*
                                            Steven J. Toll (VSB No. 15300)
                                            Geoffrey A. Graber (admitted *pro hac vice*)
                                            Douglas J. McNamara (*pro hac vice* forthcoming)
                                            Brian E. Johnson (*pro hac vice* pending)
                                            Paul Stephan (*pro hac vice* pending)
                                            **COHEN MILSTEIN SELLERS & TOLL, PLLC**
                                            1100 New York Ave, 5th Floor
                                            Washington, DC 20005
                                            T: 202-408-4600
                                            F: 202-408-4699
                                            stoll@cohenmilstein.com
                                            ggraber@cohenmilstein.com
                                            dmcnamara@cohenmilstein.com
                                            bejohnson@cohenmilstein.com
                                            pstephan@cohenmilstein.com

                                            Michael P. Canty (*pro hac vice* forthcoming)
                                            Carol Villegas (*pro hac vice* forthcoming)
                                            Jeffrey R. McEachern (*pro hac vice* forthcoming)
                                            **LABATON SUCHAROW LLP**
                                            140 Broadway
                                            New York, New York 10005
                                            Telephone: (212) 907-0700
                                            Facsimile: (212) 818-0477
                                            mcanty@labaton.com
                                            cvillegas@labaton.com
                                            jmceachern@labaton.com

                                            *Counsel for Plaintiff and the Proposed Class*